May it please the Court. Good morning, Your Honors. My name is Raleigh Wilson, appearing on behalf of the Battle Mountain Band of the Te-Moak Tribe of Western Shoshone Indians. And today, Your Honor, co-council table is Jeff Rasmussen, and also with us is Councilman Joseph Hawley of the Battle Mountain Band and a number of Western Shoshone tribal elders and leaders. Your Honors, the band easily meets the standard for plenary adjunction in this case. The band is likely to succeed on the merits, because BLM's implementation of the programmatic agreement for the Hollister Mine is attempting to write Section 106 out of federal law. Well, you're almost half there. Yes, I'm throwing out, I was surprised getting halfway through my second and third brief in this case to see a footnote saying, well, the line's been built. And this is the most preliminary adjunction was made, and the purpose of the adjunction, for example, was to keep it from being built, and it's been built. Is there anything else? And why did you add a preliminary adjunction to prevent this construction? Yes, Your Honor. The band's preliminary adjunction was to enjoin the construction of the line, but that also necessarily includes the operation of the line. The operation of the band, the power line, is now operational. It's in the valley where the TCP is located, and the operation of the line prevents the band from being able to utilize that valley for its traditional cultural purposes. I was wondering if you could obtain a trial on the merits. In other words, you're asking us to hold a judge paired in allowing the construction of the line when the line is already constructed. It may well be that you'll prevail on the merits in this case, the separation, and it may well be that the district judge on the merits will say, yes, Your Honor, the line should never be constructed. It usually should be mitigated. We can put it underground. We can knock it down. All those options are available to you as a trial on the merits, but why would you put a preliminary adjunction in the pleadings after that when you say we will suffer irreparable harm from the construction of this line? We then ask the Ninth Circuit to say, because the case would, in effect, be mooted if the line were constructed, the preliminary adjunction. So trying to figure out what remedy we can give you today, rather than send you back to the district court to say, the line is up. These guys have other, the band has other problems. They think it's the racist. It's a problem. They think that when they prevail on the merits, you should put it underground or knock it down. What's wrong with the judge? How can we remedy the wrong the judge didn't do to have a preliminary adjunction? Your Honor, there's lots of things you can do. In addition to the power line itself, we need be allowed to complete the section 106 process under the National Historic Preservation Act. That process includes identifying elements, properties, finding them eligible for the national register, and then assessing effects. Why would the LNC use a tape? He's not a district judge. The district judge can say either. Remember, it's only a preliminary adjunction. The BLM should be giving more things. The BLM should be conducting surveys. If that wasn't what you asked for in your preliminary adjunction, what do you ask the court to do? To keep things on building the line, for better or worse, the line is down. Yes, Your Honor. However, the court can enjoy an operational line. If there's a highway built on your house, that's one thing that's bad. But to have cars traveling over that highway, the noise, the honking. Is there any evidence in this record? My problem, again, I don't want to be focused solely on this, because I don't want to get you into points. On this record, we don't have any evidence. On this record, we don't have any evidence of how the line. We have consulate colleagues' declarations on how to use a set piece. The line might interfere with religious exercises. But there's no evidence in this record about how it actually drives. And you can show that to the district court, and you might be able to grant some kind of that. You know, you're not limiting it to one preliminary adjunction, of course. But the request that you did make was don't let them build the line. And for better or worse, it's built. So that's a real problem for ATMs and so forth. Please address it. Your Honor, there is no difference between building the line, and the power line, and the company using the line. Chairman Hawley's declaration in ER 296 goes directly to the types of effects that the power line and its operation will have on the ability to utilize these properties. But you didn't say let them build the line, but don't put power through it. That wasn't what you were seeking. You were seeking not to have the line built. It's not built. Power is going through it. Chairman Hawley may be precisely correct. This may be interfering with religious exercises, but that's certainly an argument that you can make to the district judge in the design of the merits, can't you? You're correct, Your Honor. And the merits can always be argued through the district court. The merits are also being argued here. And the ban is substantial likelihood to prevail on those merits in the preliminary adjunction. The preliminary adjunction can still be issued. As of you can recall, held in the Fifth Circuit, there's no telling what the district court may come up with when it's forced to apply the National Historic Preservation Act for a project that was virtually completed at that time. You join for the construction. You require BLM to fulfill the National Historic Preservation Act under a programmatic agreement in this case. In the case that you say built, what are the impacts of those preliminary adjunctions? Judges thereafter, at the end of the case, as opposed to preliminary adjunctions? I don't stand under that circumstance. We can say, even though the project is completed, if you see a lot of demerits, you can come back and the judge can figure out how to fix it. But we're sort of halfway through this case. And that's one of the cases you cite, I think, on the law, appeals for preliminary adjunctions as opposed to preliminary adjunctions. I don't even know. Thank you. Your Honor, in each of those cases, the courts found that BLM and the agencies involved, Forest Service and the Army Corps, had to complete the statutory process. I know. I understand the question. Aren't they all appeals for preliminary adjunctions as opposed to preliminary adjunctions? And I'll give you a chance if you want to sit down and think about that in your rebuttal, maybe. Yes, Your Honor. I think you'd like to address that issue in your rebuttal. So I don't know if that's with certain demerits. I'm sorry. I can't get you on it. No, no. I apologize. Your Honor, if you can read this. Your Honor, we're asking the court to require the Bureau of Land Management to fulfill the National Historic Preservation Act process and, in the meantime, enjoy the ongoing use of land, which is currently harming the Bay's ability to occupy the valley. The power line itself presents a visual obstruction, but the energy and the noise that it produces presents another obstruction. And we're asking the court to enjoy that continued use and send this back to the district court so that the Bureau of Land Management is ordered to... Please just say your clear opinion. We can't intervene in anything. We can only ask... We can only order the district court to adjoin the center service. What you're asking us to do is to order the district court to adjoin the continued operation of the line. Yes, sir. Thank you. Is that... Is the noise there what you mentioned, the noise of power in the lines or the noise of the operation of the line? No, Your Honor, it's the power in the lines. This is a 4.5-mile power line. You stand underneath them. They give off a buzzing, a hum, and you can tell it's Mahala's declaration. He testifies as to how these kinds of disturbances, these kinds of power lines, chase away its spirits, reduce the communication. It says you build a power line, Your Honor, through St. Peter's Square. There are no power lines going through St. Peter's Square because it destroys the ability for people to pray at that place. They're all underground. Your Honor, I've got an important point on appeal. The Bureau of Land Management raises for the first time that the programmatic agreement does not apply to the power line. That's simply incorrect. If you look at ER33, it's the actual original right-of-way grant for the power line. Stipulations 4 and 5 of that right-of-way grant specifically make the power line subject to compliance with the programmatic agreement. In addition... So how did constructing the power line not comply with the programmatic agreement in this case? So I understand that I could be wrong. You do agree that the programmatic agreement defines the section 106, don't you, sir? Yes, Your Honor. And as I read it, it says that section 106 didn't consider conducting a complete class D survey. Your Honor, I would say they did. Basically, they made the results available. And then later, I think everybody agrees that the TCPN issue, I don't know if you find it, should be expanded to cover the area that you are hearing about. Exactly, the place where the power line went through. But what part of the 163s did the government, as defined by the PA, did the government, BLM, reach in this case? Your Honor, on April 25, 2016, when the Bureau of Land Management determined that the power line was eligible for the National Register, every law, case, the programmatic agreement requires BLM to proceed to the next step, which is to determine the effects of the undertaking, which includes the power line, on the TCP. BLM decided not to do that, and just 28 days later, allowed the mining company to schedule a vote of all the decisions. Tell me why that violates the PA. Your Honor, the PA... Why in the abstract, if one were in a 106 process, and discovered it, and then we have to... Is this an unprecedented, is this an unexpected discovery? No, sir. Is it a new undertaking? No, sir. It's an ongoing, continuing undertaking. The programmatic agreement applies to the entire project. If you look at ER337, the project is defined as an undertaking. ER338, the agreement is intended to cover all aspects of Section 106 compliance for the project. Right. And then if you turn, Your Honor, to ER340, it sets out the familiar 4-step process of Section 106, which is identifying properties, evaluating them for eligibility, assessing them for impacts, and resolving those impacts. Your Honor, on April 25th, this TCP became eligible for the mask registry. I understand, but let's go through the process. Sure. Where did the BLM, the government, if you will, breach its duties under the defined process of the DPAs? Your Honor, if you look at ER340, when it talks about identification, it's not just a class 3 survey, Your Honor. There's a number of things listed under there, A through F. F is consultation with tribal governments. That did not happen early enough in this case, Your Honor, for the BLM to not follow up on information given by the BAN to identify this particular TCP as eligible. The BAN, after 2 years of this, Your Honor, the BAN was forced to take the BLM to the Advisory Council on Historic Preservation under dispute resolution and try to get BLM to do something with the information that BAN had been providing. In December 2015, the Advisory Council ordered BLM that it could no longer keep putting this information on the shelf, that it actually had to do something, and then ordered BLM, advised BLM, to make eligibility determinations for the information that BAN had been providing. BLM finally got about filling Section 106, as described in the PA, and on April 25th found the property eligible for the National Register. That created the complication for power line, which was to be built 28 days later. But there's nothing in the law, in any of the cases, for the programmatic agreement that allows BLM to designate historic properties and then bulldoze right through them. I understand. I would remind you that you're splitting time. I remind you that the evidence I believe you have received is fully... Thank you, Your Honor. I'm happy to address any more questions, or a couple more issues. Why don't we hear from the co-counsel? Thank you, Your Honor. Good morning. My name is Jeffrey Rasmussen. I was primarily going to be talking about the movements issue, because it may keep us from getting into the other issues. So if I have wisdom on it, we'd love to have it. Well, the question is, first of all, what we're talking about is whether this court can grant any effective relief at this point. That is the issue for this court. Well, let me ask you, isn't it effective relief for us to say, Look, all we're ruling on, all that was presented to us, is a preliminary judgment to prevent the destruction of our honor. We are powerless at this point, because the time is up to deal with that preliminary injunction. But this is the court. You have a range of options in front of you on an appropriate level of proof. And ranging all the way from ordering them to take it down or ordering them to bury it or something else, but that's not in front of us. All that's in front of us is whether you're abusing discretion in allowing the line to be built. Unfortunately, it hasn't, so we can't deal with it. Well, no, because what is in front of you, when we move to stop the construction, we're necessarily moving to stop the operation, right? And so the motion would have stopped the operation of the power line, because it would have stopped it. Of course, you're right. It's a matter of racontology. Yes. And so the question is, does this court, and it's not for this court to decide what the district court would run, for this court to say, is the case moved? Is it saying, can we grant any effective relief? Can the district court grant any effective relief? Yes, you can. You can adjoin the operation of that power line. That was within our original motion. Let me get back to the question, because I didn't realize how you divided the stuff. I guess that it is too complicated. All the cases that you cite, what you're saying to deal with permanently judges. Right. So it was sort of, and I understand, but it's a strange animal. You run up halfway through the case and say, did the judge make a mistake in doing this? I'm trying to figure out how your prejudice, if we just send it back to the district judge and say, hey, they can prove that the operation of the line violates their rights. They don't want to put it on evidence, so in effect, you don't want to hear them. But at least that's what you heard on the issue that was in front of you. We can't fix it. And, well, what you've got in front of you is, you're supposed to say, is there any possibility that district court could grant this effective relief? I'm asking that again. Remember, we're talking in terms of permanent injunctions. We're talking in terms of preliminary injunctions. Right. You can go back and file more than one case. Yes, and actually, in some ways, that's not probably unlike what's going to end up happening, even if you were to remand it, because the facts have changed since we were in front of the district court before. But what hasn't changed, and what we think is important for this court, is the case is not moved before you because you can't grant it. The case is not moved because the appeal is not moved, because the district court can grant effective relief that we've requested, which is to not let that line operate. That was within, as you said, by typology, that was within what we were initially requesting. So you're suggesting that the judge abused his discretion even if the line is built, like I'm saying, even if the line is built, the district court can grant it? What you're saying is that is something the district court could grant, and, therefore, the case is not moved. The issue right now, you know, the panelists, I think, if they could arrive, they may be able to. I think the case is not moved. Sorry, no, the case, the appeal is not moved. The appeal is not moved because the district court could grant that relief, right? So that makes it that you go on to the issues that are presented in the case, and that's what's going to probably be more important than anything else that's going to happen here, is for you to go on to the 106 process. I'm going to assert your dead right in the 15th. Okay. Violated 106. Just for purposes of discussion. Okay. What is it I'm supposed to tell the district judge? You're supposed to tell the district judge the correct analysis of the 106 process to resolve those legal issues that are presented in an appeal that is before you. Okay. Those issues have only been resolved. They haven't been resolved. The judge just said, Here's my view of your probability of success. Right. The judge will resolve those issues in the final order. Right. We'll give it a shot. Right. And said, We normally don't instruct judges halfway through the trial about how well they're doing on the law. Tell me what we're supposed to tell the district judge. We are supposed to tell the district judge that the analysis in this preliminary injunction order with regard to the 106 process and the programmatic agreement and his misinterpretation of the programmatic agreement was wrong. You have the authority to do that because the appeal here is not moved. And, therefore, you do go through the analysis of his preliminary injunction and you do tell him where he was wrong in that analysis in his preliminary injunction. The time is incredibly likely to succeed on the merits of this case. If we go back now and we do a new preliminary injunction and we have the judge doing the same analysis, we're going to be back here again because he's going to say, No, they don't have to do the 106 process. They don't have to do any of these potential mitigations. They don't have to consult at the time. And that's what you would correct the error in the order that is in front of you that is in front of you for review. And then you do that because the case is not moved because the judge could give effective relief. And so you can send it back to him to give that effective relief. But you correct the errors of the preliminary injunction based on the merits issue and the likelihood of success on the merits issue, which is within that order. So I'm going to reserve the last minute of my time. Thank you. Thank you. We'll hear from the arbitrator again. And how are you defining your argument? Are you going to define your argument? Yes, Your Honor. My name is James Mason, and I'm here today on behalf of the United States. Also with me at the counting table is Laura Grenier. She represents the Heinen Company. And we're going to try to split our argument. I'm sorry. We're going to try to split our argument. I'm going to take 12 minutes, and she's going to take eight. I will try to remind you. Thank you. So the appeal, as the court has suggested, should be denied because it's moved and because the man is not manned and required showing a correct report. All right. Please sign. Joe, please proceed. There's a declaration in the record from Councilman Hawley that says, only apart from the visual aspects of the line, its operation will interfere with our exercise of the legislature's rights. Again, whether or not it's a meritorious act or not, it's the case of the people. Can't we say that we believe this and believe that their case is made? We should enjoy the operation of the line. They haven't shown that that is presenting an imminent threat of irreparable harm. The entire focus of their motion for preliminary injunction, and then again when they moved for an injunction pending appeal, was that the construction of this power line, which is all they sought to enjoy, and Council has admitted today that that's what they sought to enjoy, and you can see it in the record in CR 424, was going to result in the bulldozing of sacred sites. That was the emphasis in all the emergency motions that have gotten us here today. They have not argued that the continuing operation of the line is going to cause an imminent and irreparable harm. Now, Councilman Hawley expresses his deep concern in his declaration that this is going to, that the ban will not be able to access this area for a generation for the religious practice. And we can hear that. We didn't really talk about access. We talked about what effectively worship, and yes, the sites are restricted, but that the power line is going to interfere with their religious practices. And we take those concerns seriously, but those are issues that were not presented in the P.I., that were not argued. If they want to bring a renewed motion for preliminary injunction based on that showing irreparable harm, they can do that and let the district court secure it first. They've said that it's not moved because they want more process under the Traditional Historic Preservation Act. Again, those are issues that can be dealt with by the district court on the merits of the case. Do they ever complain about district courts Well, right. I mean, that's the fundamental, if you're talking about the merits, the sake is I mean this for a moment, Your Honor. That's the fundamental promise that the ban has ignored the essential role that they needed to play in this process. We're talking about a traditional cultural property here. It's important to remember that those that define this is not merely a set of archaeological objects on the ground or location. A traditional cultural property is defined by the ban's religious practices and their religious beliefs. We don't have no way to know what the ban does at these sites unless the ban tells it. And the ban was silent during this process. They weren't entirely silent. They did identify. What they basically said is we'd like this whole area identified. That's right, Your Honor. Sorry. The ban, BLM spent six years looking at this issue. We can't say what would happen if the ban had simply told BLM at any point during those six years that they were deeply concerned that this power line would interfere with practices and have this traditional cultural property intact. It never came up. The ban did submit those comments on the final environmental impact statement. They focused on general concerns about the Tosewi Quartz. And I want to point out again, we take those concerns seriously. BLM has two archaeologists on its staff, one of whose job is to work with the ban to develop a plan to protect the Tosewi Quartz. That's a vastly larger area than the traditional cultural area that's an issue in this case. Let's put aside for a second actions or demands in action or whatever. Despite, for me, how the PA process is supposed to work, when belatedly the BLM, I think nobody disputes it quite correctly, comes to the conclusion that geographic area, GCD, would be expressed. So this is complicated, and this doesn't count to a lot. As I actually pointed out, these issues haven't been raised in the district court. The district court hasn't had an opportunity to hear these, which is another reason why, if this appeals to satisfy whom has moved, the district court can take a crack at all of this or through it all, and you'll have the benefit of a better record and a more cogent explanation. But the answer is it's an actual process. Right. Or they didn't tell you the detour answer. Tell me how it works. The PA, the program agreement, doesn't require any further process on the power line because when we wrote it, we thought we were done with the power line. Okay. The PA has provisions that require further process on other aspects of this overall mining project, right. It has provisions that the Postal Council decided to deal with, surface exploration, mining, as those go forward. We don't know exactly where all that's going to happen because the company goes out looking for minerals, and then they follow up with test spores, dry mines, geosynthetics. So this process requires the focus of what we're introducing here. So what we have, as I understand it, is you've done your grass-roots survey, you've gone through the processes, and then the power line has been approved. And then somewhere down the road, just before the construction permits are issued, and I know we've got less than time, I think, everybody agrees that there's going to be TCP on it, you'll be able to order it in two weeks, you can start with it in three weeks, you can finish it in three weeks. Is that fair? So what's supposed to happen under the PA when that series begins? So the answer is nothing. The programmatic agreement that we have doesn't provide for more process under the power line. Let me take a few points on that. There is a discovery plan under the programmatic agreement that the Postal Council noted. The right-of-way incorporates that discovery plan by reference. That's a plan for discovery objects. We're out there doing construction. It doesn't apply here because this is a traditional cultural property. It's not defined by objects. It's not an open source. It's not an archaeological issue. You can't find it, but we're making something up because it's based on the mantle leaves. And those provisions define TCP and the objects that trigger the discovery plan separately. The second set deal with surface exploration and mining, and the process that BLM and the mining company will consider, the mining company will submit a work plan, we'll find out where they're going to do mining. BLM has to approve that plan, and we'll determine whether we need to do more work. Right. The reason we're getting off is we're not really talking about the mining companies. Right. We're talking about what are your obligations with respect to TCPs that have only become a purity of the process. Our answer is under the programmatic agreement, nothing. Because we tried to do this beforehand. We thought we had completed our work, and the process didn't work, and it didn't work because the band never told us that this TCP was there. Now, look, I'm not going to tell the court that we think this programmatic agreement is working as well as it should. Everyone's concerned about the way it's working. BLM is concerned, and BLM takes these obligations seriously. So it's the parties. I meet everyone. BLM, the Nevada State Historic Preservation Officer, the Advisory Council on Historic Preservation, the mining company, and the band had a full-day meeting on February 1st to try to work out or revise the programmatic agreement. So we want this process to work. We take our obligations seriously, but when the band doesn't tell us these things, we weren't aware that this issue could arise. We advised the EPA that it doesn't require a further process, and we didn't consider it beforehand because we didn't know it was there. The band's argument, I take it, they have able lawyers, so I want to make the argument for them. Let me try. He said if you'd only listened or consulted more, you would have known these facts, and it was the BLM's failure to sufficiently consult and capitalize on this problem. I don't see any evidence of that in the record. And as you've pointed out, the band has long felt that the entirety of the Tocqueville quarry should be projected for mining, and they raised those issues. But you can read their letter on the final environmental impact statement, their comments, and they never raised this power line issue. It wasn't until nine months afterward, after we had approved the power line, and issued the right-of-way, that we finally learned that they wanted the power line buried instead. In the environmental impact statement, BLM actually considered burying the power line and concluded that it would do more harm to the EPA. You've got to dig a trench up the whole mountain, so they rejected that possibility. So, again, this appeal is due because there's no relief left to grant. That's not precious to the band. We'll go back to the district court. They will have their day at court. They can seek a new PI if they want to. All these issues, these complex issues about the programmatic agreement that the district court didn't hear can be resolved, and then, as necessary, we can come back to this court and debate this further. When you say the district court didn't hear this, what do you say to that? Wasn't that the basis of what was being argued? Wasn't the argument, wasn't it? No. Not sufficient 106 compliance. Everybody agrees that the PA replaces the statutory process, the 106. Wasn't that exactly the issue in front of the district court? Those are broadly the issues, but we didn't get into the nuts and bolts of what the specific terms of the PA were, why it did or didn't require further process on the power line. You know, it came up on a motion for further injunction. Obviously, the issues were a bit of a moving part, and there were other issues that were pretty well recorded that haven't arisen here. I mean, let me give you an example first. You know, what discretion does BLM have left over this? We've issued a right-of-way. The mining company now has a legal right to build the power line. Does it have the discretion to require the power line to be buried? It probably doesn't under the existing right-of-way. Does it have the discretion to grant other mitigation measures that the ban might find appropriate? Maybe. But those issues could be dispositive of this case. I understand that. But surely in finding that the ban did not give the same probability of subsidy to barriers, the district judge concluded that it was more probable for not the PA to comply with you. Because that was our whole argument. The district court makes the right decision, but because the briefing and the issues were somewhat slippery, the court got there on a somewhat different path. So I don't know that there's part of the decision that really delays out what the terms of the PA are and why they don't require further process here. I have one question. Go ahead, Nate. Go ahead, Nate. In the area that is expanded, which is a sub-example of the D.R.C. production area, did this change anything on the ground that had been known before? In other words, it seems to me that the area that we were going to build is power lane. It's known where we're going to build it. And we have not sure what most of our process is done before we were told that this cultural and legal area would be expanded. Did anything after that have been said about it? You have privileges, objects, or practices in this area? No. The short answer is no. There are other traditional cultural properties recognized within the area of the Tosavine Quarries that were recognized before, but they're not here. They're not where this power line goes. We didn't realize there was one in the way of the power line. We did realize that there were archaeological objects. So we had the entire length of the power line corridors surveyed under what they call a Class III survey, the most thorough survey. And we required the mining company to avoid all those known archaeological objects. And we had to have tribal monitors present during construction. And we updated the surveys and found new objects that required them to adjust the path of power. But because they didn't know this was here before we approved the power line and issued the right-of-way, we weren't able to incorporate the protections for this. I know that one of your colleagues, Andy Irvin, is eager to be here and maybe see if he can address this. But is it the government's position that once you approve the power line, you should be able to retain it? Does it go forward? That's the critical point for us to look at, not with the construction company. Yes, and under these circumstances, where you have a programmatic agreement that doesn't provide further processes for the power line, that was the end of our... That was the end point. Thank you. Thank you, Your Honors. Good morning, Your Honors. I'm here today to please the Court of Law of Grineer on behalf of Carlin Researchers. There is no evidence in the records, Your Honor, that the BLM did not enlist appropriately during the consultation process. And, in fact, during the six-year process where the Section 106 process was undertaken, there is evidence in the record at ER 55 that the entire corridor had a Class 3 survey completed. At ER 64, that in the 1990s, there was consultation with the band and other tribes. There were two CPs identified in 1999. At ER 65, we have documents about consultation, including during the NEPA process, that the band and other tribes did field trips to the project site. They participated in this process. They raised concerns about the power line. The power line concerns at the time were, if you build this, it will bring other development. And, in fact, the BLM did listen. And the EIS and the final EIS said, we understand that concern, but the power line will be deconstructed during the completion of the mining process. So the BLM not only listened, they responded. So they raised the question, and again, they got many of these interpreters right here, so they could help make the thing. But at least at some point, the band says, this whole area, when you look at the power lines, there was a sustained problem. And, therefore, we rejected the power line on that basis. Is that a fair statement to make? Yes, Your Honor, but the question is timing and when they did that. Okay, but that was done earlier than the point in time when this particular TCP that we're here today about was identified. Not specific to the power line, Your Honor. In fact, the EIS, the draft EIS, identified possible undergrounding, and the band had raised this specific use that they raised for the first time in March of 2018. No, I understand that. I understand that. We all agree when the band first came forward and said this specific site has religious CPUs, and, therefore, we think it should be a TCP. I'm asking a different question. You do agree that at some earlier point in time, perhaps for the most expensive TCP, the band said this whole area is a TCP. Yes, Your Honor, the band has made generalized arguments in the past that the whole area is a TCP, presented evidence to BLM. The BLM concluded it was not. And the band is a great question, Your Honor, because at that point, at some point, the band could have filed, Your Honor, could have challenged that decision. They did not. They did not. And at that point, if the band had challenged the decision, it could have been considered an EIS process. They could have exhausted their administrative remedies, which they did not. But, instead, the BLM... Well, let me ask you about administrative remedies. Where in the regs of the statute is there a requirement that we appeal the remedy? I know there's a... It says you may appeal it, but it doesn't say you must. I think, Your Honor, I don't know if the reg says you must, but I think the concept of exhaustion is you give the agency the opportunity to correct its own errors. That was never done here, because this information wasn't provided. Are those an agency decision in which they break whatever objections they put as a remedy? My question is, is the appeal a necessary part of the agency decision? As I read this statutory... And we've said in the past that optional appeals are required. So, it's almost like an optional appeal to make one reason or another for the remedy. Well, Your Honor, I would say it definitively was not an optional appeal under the Apache case because of logics. The government here clearly, and the mining company, relied on the information that was within the tribe's knowledge. Two separate issues, I think, in my own mind. One is whether you're just barred from raising the issue because there's a big cost. The other one is whether you're stuck with whatever record you made at whatever point you're exhausted and you're denied. I understand the second argument. I'm sure the first one that this statutory scheme or the regs demonstrate that the agency requires everybody to appeal if they're satisfied with the record they made. And you're a decent teacher. They may not. The regs may not. I suppose I should have asked the agency then. They may not, Your Honor. But again, I think under the Apache case, there is a reason that you can't sit around with information that only you have and withhold that information until the final agency action is concluded, the process is concluded in the record of decision, which gives the mining company a valid existing right upon which it relies. No, I understand your argument. I understand your argument perfectly there, which is that they want to make a record. It's got to be before the agency decision is final. My question was very different, which is whether or not for the agency, whether or not they were required to appeal in order to obstruct the administrative records. And I think, you know, the stat secure precise question may be that they were not required to appeal perhaps within the 30 days. But I believe under Apache, they were required to act before they intended, before at least you have the record of decision here in 2014. We are now two years later before they come forward with the specific information. That's unrefuted in the record. But the N does not provide any evidence to refute the Atkins declaration. Dr. Atkins, who says it was for the first time in March of 2016, they provided the specific information. And in fact, the ACHP looked at the issue, Your Honor, of whether there was violation of the PA. The ACHP also looked at why, excuse me, the Archival looked at, you know, why wasn't this information provided sooner. And in fact, it's in the record, at SCR 415 and 355, 335, excuse me, that the ban withheld this information because they considered even revealing the information to the PLO would go against their religious beliefs and so they withheld the information unrespectfully. The process can't work that way where you take agency action to completion. You have a process where you need the consulting information and then only after that, not even after the raw issues, but two years later, after everyone has gone through all of the necessary steps to get to putting their shovels in the ground, all of a sudden this information becomes available for the first time. To answer another question you asked earlier about the programmatic agreement, where is the violation of the programmatic agreement? There isn't one. And in fact, the ACHP looked at that issue as well. And in ER 335, the ACHP went through the programmatic agreement and said there's an identification process and consultation that occurs during the Class 3 survey. Once that Class 3 survey is completed and that consultation has ended and the PLO has satisfied its obligations, there is no law that allows the PLO to reopen the rod as the band is requesting now, based on information that was available to the band but was not shared with the PLO or the company for more than 10 years during the process. Thank you, Cass. Thank you. We didn't leave any time for rebuttal. Did you have some time for a rebuttal? Take it. Thank you, Your Honor. Just to correct a couple of things, Your Honor. The band relied on the BLM in this case all throughout the draft and problem impact statement. BLM repeatedly told the band, thank you for your concerns about these TCPs and it will be addressed in the programmatic agreement. Well, we're at the programmatic agreement stage now and suddenly we can't address these things any longer. Specifically, in the record, Your Honor, this Class 3 survey that BLM conducted along the power line route that only focused on archaeological resources. And you can see that in the environmental document. Also in place there, Your Honor, is a reference to a 1992 study conducted by BLM's contractors. BLM's contractors found that the entire area was eligible as a TCP. And in addition to that, they found that the area along Little Antelope Creek was potentially a TCP because of secret sites and other areas and uses in that area. It was the BLM, Your Honor, that stepped on this information, not the band. BLM didn't bring this information forward and do something with it until after the band went to the advisory council and said advisory council, BLM's not implementing this PA. And the advisory council stepped in and said BLM, you need to do something with this information. The band, Your Honor, is taking finality here. We have an ongoing Section 26 process that never ends because the BLM never makes determinations whether project activities will affect historic properties or not. There was no information provided by the guy from 1999 about this TCP thing? Yes, Your Honor, there was no information. I don't understand the case in the Tenth Circuit when BLM has a reasonable knowledge that there are lots of sacred objects in an area. The Tenth Circuit has held that it's BLM's obligation to follow up on those things. It's not the band's job to determine things eligible for the National Register. That's BLM's job. Here's my concern about that. Perhaps we don't get to make this case. This is not an objects case. This is a lucid area case, right? Yes. You know what you're saying. It's both. Yeah, but at least with respect to the expanded area. The expanded area, Your Honor, the Council for the BLM makes a good point. What's been identified are archaeological resources, but there are also cultural resources like rock shelters, prayer grounds, prayer points, and used things as well. So focusing on the use issue. Yes, Your Honor. Once your client's in, to finish up with enough information, do you have to process and continue to come up with things on their end or not? Your Honor, my client's a Bellarmine band and relied on BLM's representations. No, no, no. I understand your argument on that point, but I'm asking a different question. I'm not looking for you to give up your argument. I'm just saying, isn't it true that they didn't really notify the federal authorities in this specific area was one in which religious observances were performed in favor of the BLM? So, Your Honor, in 1998, BLM's contractors performed ethnographies. That's the same question you're asking. I'm asking, once your client's in, the BLM's contractors, my client's told the BLM's contractors in 1992 that this area... This was a possible concern. Yes. The information that we now have that your client's actually used this area for religious observances. And you're right, Your Honor. The band filled out that information more recently, but only because the advisory council told BLM that you felt there would be something with it. And I'm not being critical. It's true. In fact, you didn't fill that information out until later in the process. Before we have to, Your Honor, early on, and then also after the advisory council directed BLM to do further work. Okay. Thank you, Your Honor. The case is submitted. I want to thank both sides for their very helpful briefs and arguments. We will be in recess today.
judges: Siler, Canby, Hurwitz